CHOI & ITO
Attorneys At Law

CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
cchoi@hibklaw.com
aito@hibklaw.com

Proposed Attorneys for Debtor
and Debtor-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>THE MINESEN COMPANY, a Colorado corporation,<br><br>        Debtor and<br>        Debtor-in-Possession. | BK. NO. 19-00849<br>(Chapter 11)<br><br>HEARING<br>DATE:<br>TIME:<br>JUDGE: Hon. Robert J. Faris |

## OMNIBUS DECLARATION OF MAX JENSEN
## IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

      I, MAX JENSEN, hereby declare that, I am over the age of 18 years old, and I competent to make this declaration and I make this declaration upon my personal knowledge, except as otherwise stated. If called and sworn as a witness, I could and would testify competently thereto.

1

80513

1. I am the President of The Minesen Company, a Colorado corporation and the debtor and debtor in possession herein (the "Debtor"). Unless otherwise stated, I make this declaration upon my own personal knowledge and my review of Debtor's books, files, and business records.

2. This Declaration is submitted in support of the Debtor's "First Day Motions," including:

- Application to Employ Choi & Ito as General Bankruptcy Counsel to the Debtor ("Employment Application")

- Motion For Order Authorizing Debtor To Pay Pre-Petition Wages And Other Employment-Related Costs And Expenses And To Honor Pre-Petition Employee Benefits ("Wage Motion")

- Motion For Order Under 11 U.S.C. §§ 105(A) And 366(C) (I) Prohibiting Utilities From Altering Or Discontinuing Services On Account Of Pre-Petition Invoices, And (II) Establishing Procedures To Determine Requests For Additional Assurance Of Payment ("Utilities Motion")

- Motion for Order Authorizing the Debtor to Honor the Existing Merchant Service Agreement ("Merchant Services Motion").

- Motion For Order Establishing Notice Procedures ("Notice Procedures Motion")

3. The Debtor owns and operates the Inn at Schofield Barracks (the "Inn"). The Inn is located within Schofield Barracks, a United States Army base located in Wahiawa, Oahu. Schofield Barracks is the home base of the Army's 25th Infantry Division, known as the Tropic Lightning Division. The Inn is open to authorized military and retired military personnel.

4. On July 4, 2019 (the "Petition Date"), the Debtor filed an emergency petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Hawaii (the "Court").

**Current Operation, Status and First Day Motions**

5. The Debtor has been managed by Pangolin LLC, a Colorado limited liability company ("Pangolin") since 2014. Pangolin's management contract requires the Debtor to pay 5% of gross revenues to Pangolin, in arrears. Pangolin is owned almost entirely by me.

6. As of the Petition Date, the Debtor has:

(a) Cash of approximately $4,051;

(b) Inventory valued at approximately $29,185 in the convenience store and $14,174 in the restaurant, as of late June, 2019; and

(c) Receivables from the Australian government totaling approximately $149,000.

7. The Debtor currently has approximately 82 employees working at the Inn, adjacent restaurant and convenience store. Virtually all of the employees are full-time employees. Approximately half of whom are military dependents at the Inn, which results in regular turnover of employees. I am on the Debtor's payroll.

3

8. In the Employment Application, the Debtor moves the Court for an interim and final order authorizing the Debtor to retain Choi & Ito ("C&I") as its general counsel for its Chapter 11 bankruptcy proceedings.

9. I am informed C&I has considerable experience in representing debtors as debtors-in-possession under chapter 11 of the Bankruptcy Code. I believe that it is in the best interest of the Debtor's estate that C&I be employed to represent the Debtor effective as of the Petition Date on an interim basis as the Debtor cannot appear pro se.

10. I have reviewed the Wage Motion and all of the facts set forth in the Wage Motion are true and correct to the best of my knowledge, information and belief.

11. Attached to the Wage Motion as Exhibit "A" is a true and correct copy of a list of the gross and net pay received by the employees for the period ending June 30, 2019.

12. Attached to the Wage Motion as Exhibit "B" is a true and correct copy of a list showing the total accrued sick pay for all the employees and the earned and accrued vacation pay due employees.

13. Through the end of July 2019, the Debtor's employees were covered by UHA or Kaiser for health/vision and drug, and HDS for dental. The payments to UHA, Kaiser and HDS are paid each calendar month in advance. To the extent

4

80513
U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 8   Filed 07/05/19   Page 4 of 11

relief is needed to maintain these benefits, Debtor seeks authority to pay any pre-petition claims for said benefit payments.

14. I have reviewed the Utilities Motion and all of the facts set forth in the Utilities Motion are true and correct to the best of my knowledge, information and belief.

15. I fully expect that the Debtor will be able to continue to pay on a current basis the cost of operating its business, including the payment of Utilities (as defined in the Utilities Motion) in full on a monthly basis in the ordinary course of its operations.

16. Attached to the Utilities Motion as Exhibit A is the most recent itemized list of all Utilities which presently provide service to the Debtor. The list also shows that for a typical month, the combined total of all payments to be made to the Debtor's Utilities is approximately $13,062.00, exclusive of payments to the Army Garrison referenced in paragraph 33 below.

17. I have reviewed the Merchant Services Agreement Motion. All of the facts set forth in the Merchant Services Motion are true and correct to the best of my knowledge, information and belief.

18. Were credit card sales to cease or be disrupted, the Debtor's operations could suffer immediate and irreparable harm due to lost sales, disruption to the Inn's normal operations, and damage to customer relations and

5

loss of goodwill. Even a minor interruption of "business as usual" could result in attrition of consumer confidence and loyalty.

19. I have reviewed the Notice Procedures Motion and all the facts set forth in the Notice Procedures Motion are true and correct to the best of my knowledge, information and belief.

**History of the Inn at Schofield Barracks**

20. On November 30, 1988, the Army requested proposals for the design, construction and operation of a transient lodging facility located entirely within Schofield Barracks, would offer lodging exclusively to military personnel, military families, and other qualifying persons, and would be considered "government quarters" under the Joint Federal Travel Regulations. This designation was important because military personnel were required to stay at the Inn (subject to availability) or forfeit their per diem reimbursement for lodging.

21. On January 14, 1993, the Department of the Army/U.S. Army Installation Management Command G9, Army Morale, Welfare and Recreation Fund ("MWR") awarded Contract No. NAFBA3-93-C- 0001 (the "Contract") to build an "economy/limited service lodging facility" at Schofield Barracks to the Debtor. The Contract is for a term of 32 years.

22. On February 1, 1993, the Debtor and the Department of the Army entered into a long-term ground lease identified as Lease No. DACA84-1-91-14

(the "Lease") for about four acres of land for rent of $1.00 for the entire term. Both the Contract and Lease expire May 31, 2026. The Lease is contingent upon the viability of the Contract (*i.e.*, if the Contract is terminated, the Lease will also terminate). In addition, the Debtor is a party to a separate 5-year "triangle lease" signed in September 2018 (but effective as of May 15, 2017) for approximately 0.62 acres of land adjacent to the Inn which serves as a playground area for Inn patrons.

23. The Contract required the Army to ensure that all Army travelers patronize the Inn. If the Inn were fully occupied authorized travelers would receive a Statement of Non-Availability ("SNA") from the Inn which authorized Army travelers to receive their full per diem payment. The Contract also gives the Debtor a "right of first refusal" to construct any additional transient lodging rooms at Schofield Barracks.

24. The Debtor pays $1.00/occupied room/night at the Inn to the MWR; and an additional $1.00 per occupied room for each night in which percentage occupancy at the Inn exceeds 90% cumulatively for the year.

25. The Inn opened for business in June, 1994. The main Inn consists of 192 rooms located in a two story building. In addition, there's a housekeeping building with a manager's apartment which is not used by the guests and a separate two-story administrative building in which is located a restaurant called Lightning

Strikes Café and a 24-hour convenience store as well as a single story wood shop which is used for maintenance.

**Debtor's 1998 Dispute, Litigation and 2017 Settlement with Army**

26. In 1998, the Army issued a new policy which substantially reduced the Inn's occupancy by allowing personnel to stay at "non-government lodging." In February of 2000, the Debtor made claims under the Contract against the MWR which were appealed to the Army Board of Contract Appeals after the Contracting Officer (an MWR representative) denied them.

27. After years of litigation to establish the Debtor's quantum of damages (which cost the Debtor millions of dollars in legal fees), the Debtor and MWR (through Contracting Officer Jennifer C. Sherman) entered into a Settlement Agreement (the "Settlement Agreement") on April 28, 2017, pursuant to which, the Army paid the Debtor $8,375,000 (the "Settlement Amount") to settle the Debtor's breach of contract claims and agreed to amend the Contract that requires soldiers assigned to Schofield Barracks would report to the Inn and receive an SNA to be reimbursed if they stay at alternate facilities.

28. However, the Settlement Agreement also provides that if the Contract is terminated for Default or Terminated for Non-Feasibility, MWR is entitled to a "Reimbursement Amount" of up to 25% of the Settlement Amount, subject to downward adjustment based upon the number of years remaining on the Contract.

29. In May, 2018, about a year after consummation of the Settlement Agreement the Army Garrison, at the direction of MWR, announced that the Inn was no longer considered "government quarters," purportedly because of the Contract amendment signed per the Settlement Agreement had such an (unintended) effect. Inn occupancy substantially declined as a consequence.

30. The Debtor made a claim to the Contracting Officer challenging MWR's interpretation and sought relief, including seeking a reinstatement of the process of requiring SNA's for soldiers to receive additional per diem. Ms. Sherman denied the claim and we appealed the denial on June 10, 2019 to the Army Services Board of Contract Appeals.

31. Beginning in March, 2019, MWR (through Contracting Officer Jennifer C. Sherman) began demanding changes to the operations of the Inn and payment of certain alleged delinquent utility charges.[1]

32. On or about June 20, 2019, MWR informed the Debtor that MWR considered the Contract to not have been cured and that the Contract would terminate on July 16, 2019.

33. The latest demand from MWR is dated June 25, 2019. Among other things, MWR notified the Debtor that "beginning on or about June 25, 2019,

---

[1] The Debtor is billed in arrears for major utilities charges (electricity, water and sewer) by the Directorate of Public Works ("DPW"), a Division of the Army Garrison Hawaii. The DPW bills, however, increased dramatically without explanation or backup. Rather than risk a default, the Debtor paid close to $570,000 to DPW in June, 2019.

9

80513
U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 8   Filed 07/05/19   Page 9 of 11

USAG-Hawaii will begin notifications to incoming and outbound soldiers . . . that the Inn will be closed effective July 18, 2019.

34. Notably, MWR also demands that the Debtor "make the Reimbursement Amount Payment, which is $1,256,250 . . . for this termination for default no later than Jul 18, 2019." I believe this demand underscores the true intent of the Army (acting through MWR) in seeking to terminate the Contract rather than allow the cure of alleged defaults.

35. For five years, the Debtor was current on its monthly debt service payments to its secured lender, First Hawaiian Bank ("FHB") in the approximate amount of $103,000.00.[2] However, due to MWR's purported termination of the Contract, FHB pressured the Debtor to pay off the loan balance of close to $5.8 million.

36. On or about June 18, 2019, the Debtor entered into a Subrogation Agreement with Pangolin. Under the Subrogation Agreement, Pangolin agreed to pay FHB the full amount of the Loan in consideration of becoming a subrogated lender as to the Loan and a successor to FHB under the loan documents. The Debtor and Pangolin executed two Subrogation and Document Adoption Agreements dated June 18, 2019: the first of which the Debtor and Pangolin agreed

---

[2] In 2014, FHB loaned the Debtor $10,000,000. The FHB loan was secured by substantially all of the Debtor's assets, including but not limited to, a mortgage on the Lease, and a security interest in the FF&E, and accounts receivable.

that all references to FHB in the Mortgage shall mean Pangolin, and the second of which the Debtor and Pangolin agreed that all references to FHB in the Security Agreement shall mean Pangolin.

37. On July 2, 2019, Pangolin recorded a UCC-1 financing statement at the State of Hawaii Bureau of Conveyances. Pangolin consents to the Debtor's use of "cash collateral" of Pangolin.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: Honolulu, Hawaii, July 5, 2019.

/s/ Max Jensen
MAX JENSEN