

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

In re:

THE MINESEN COMPANY,

Debtor.

Case No. 19-00849
Chapter 11

Re: Dkt. 100

## MEMORANDUM OF DECISION REGARDING

## ASSUMPTION OF EXECUTORY CONTRACTS AND LEASES

The Minesen Company, debtor and debtor in possession ("**Minesen**"),

has filed a motion (ECF 100) for authority to assume the following contracts

and leases pursuant to § 365:[1]

---

[1] Unless otherwise indicated, all references to sections refer to the Bankruptcy Code, 11 U.S.C., and all references to rules refer to the Federal Rules of Bankruptcy Procedure.

1

1. Contract No. NAFBA3-93-C-001 between Minesen and US Army Morale, Welfare and Recreation Fund, a Non-Appropriated Fund Instrumentality, dated January 14, 1993 (the "**MWR Contract**," Ex.[2] M-1);

2. Amendment / Modification No. P00018 to the MWR Contract, dated April 18, 2017 (the "**MWR Contract Modification**," Ex. M-2);

3. Lease No. DACA84-1-91-14 between the United States of America through the Secretary of the Army, as lessor, and Minesen, as lessee, dated February 1, 1993 (the "**Lease**," Ex. M-3);

4. Lease No. DACA84-1-17-121, between the Secretary of the Army, as lessor, and Minesen, as lessee (the "**Picnic Area Lease**," Ex. M-5); and

5. Memorandum of Agreement between the 25th Infantry Division (Light)/US Army Garrison Hawaii; US Army Community and Family Support Center; and Minesen, effective May 11, 1994 (the "**Operating Agreement**," Ex. M-4).

---

[2] "Ex." refers to trial exhibits.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 2 of 57

The court held an evidentiary hearing on the motion on June 2, 3, and 7, July 28 and 29, and August 2, 5, 12, 18, and 19, 2021. At the evidentiary hearing, Johnathon Bolton and Janice Futa represented Minesen, Dana Barbata and Natalie Moreland represented the US Army Morale, Welfare and Recreation Fund (the "**Fund**"), and Christopher Muzzi represented Pangolin, LLC.

This memorandum sets forth my findings of fact and conclusions of law.[3]

## I.    BACKGROUND FACTS

Minesen operates a hotel known as the Inn at Schofield Barracks (the "**Inn**") on the U.S. Army's Schofield Barracks installation. The Inn is a "transient lodging facility," or "TLF," that provides housing for servicemembers and their families, usually when they are changing duty stations to or from Hawaii or are temporarily assigned to Hawaii.

The Lease and Picnic Area Lease authorize Minesen to use the land on

---

[3] Fed. R. Civ. P. 52(a)(1), made applicable to this contested matter by Fed. R. Bankr. P. 9014(c) and 7052.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 3 of 57

which the Inn is constructed and an adjacent recreational area. The MWR

Contract, as modified by the MWR Contract Modification (and other written

modifications), states the terms under which Minesen constructed and

operates the Inn. The Operating Agreement specifies certain aspects of the

relationship between Minesen and the Schofield Barracks garrison

command, including the provision of electricity.

The MWR Contract (as modified), Lease, Picnic Area Lease, and

Operating Agreement (collectively the "**Contracts**") are inextricably linked.

The MWR Contract required Minesen to enter into the Lease and the

Operating Agreement; the Lease, Picnic Area Lease, and Operating

Agreement each provide that they terminate when the MWR Contract

terminates; and a default under the Lease is a default under the MWR

Contract and vice versa. The MWR Contract will expire on May 31, 2026.

## II.    LEGAL STANDARDS

Minesen moves for authority to assume the Contracts under § 365(a):

"Except as provided in sections 765 and 766 of this title and in subsections

(b), (c), and (d) of this section, the trustee, subject to the court's approval,

4

may assume or reject any executory contract or unexpired lease of the debtor."

Minesen, as the debtor in possession in this chapter 11 case, has the power of a trustee under § 365.[4] There is no dispute that the Contracts are executory contracts and unexpired leases within the meaning of this section.

Section 365 (b)(1) places conditions on the assumption of a contract that is in default:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption . . .;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

---

[4] § 1107(a).

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 5 of 57

(C) provides adequate assurance of future performance under such contract or lease.

A party seeking to assume a contract need not cure immaterial breaches. *See Vanderpark Properties, Inc.* v. *Buchbinder* (*In re Windmill Farms, Inc.*), 841 F.2d 1467, 1473 (9th Cir. 1988) (holding that alleged nonmonetary defaults were not of sufficient substance to preclude assumption of the lease); *In re Rachel Industries, Inc.*, 109 B.R. 797, 799-800 (Bankr. W.D Tenn. 1990) (describing that, if a default of the debtor's obligations existed, the Court must analyze each of those asserted defaults to determine whether any is material); *In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) ("A default precludes assumption of an executory contract under § 365 if it is both incurable and material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange.") (internal quotations omitted).

Minesen must also show that it has exercised reasonable business judgment in deciding to assume the Contracts. *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000) (stating that "a

6

bankruptcy court applies the business judgment rule to evaluate a trustee's rejection decision"); *In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015) ("The propriety of a decision to assume or reject an unexpired lease . . . normally is determined under the deferential 'business judgment' test.").

Section 365(c)(1) bars the assumption of certain contracts and leases:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment . . . .

Under § 365, the nondebtor party to the contract has the burden of coming forward with all alleged defaults and demonstrating that any required notice of default has been properly given. *Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of Social Servs. (In re Kings Terrace Nursing Home & Health Related Facility)*, Case No. 91 B 11478

7

(FGC), 1995 WL 65531, at *26 (Bankr. S.D.N.Y. 1995). Once defaults are properly established, the burden then shifts to the debtor to prove that the defaults have either been cured or will be cured promptly and that there exists adequate assurance of future performance. *See id.; In re Rachel Industries*, 109 B.R. at 802 ("In a proceeding under § 365, the party moving to assume a lease has the ultimate burden of persuasion that the lease is one subject to assumption and that all requirements for assumption have been met. However, the [non-debtor] has the initial burden of showing defaults and that those defaults have been properly noticed to the lessee.") (internal citations omitted).

Thus, the Fund must demonstrate the existence of material defaults, but Minesen must ultimately prove by a preponderance of the evidence that those defaults have been or will be cured and that there is adequate assurance of future performance.

## III. DISCUSSION

### A. The Fund's Motivation

Minesen argues that the Fund is acting in bad faith. It contends that the

Fund wants to terminate the MWR Contract for default because in that event the Fund will be able to recover part of the money it paid to Minesen in a 2017 settlement (discussed in section III.D.1 below). I reject this argument.

First, the evidence does not bear it out. The Fund and Minesen have fought for many years, but Minesen bears at least equal responsibility for that situation. I find that the Fund seeks to hold Minesen to the terms of the Contracts because it is entitled to Minesen's performance under those Contracts, and not for some improper motive.

Second, Minesen's argument is an attempt to deflect attention from the real issues. The central question is whether Minesen can satisfy § 365. Minesen bears this ultimate burden even though the Fund hopes that it cannot or will not do so.

## B.    Anti-Assignment Act

The Fund argues that § 365(c)(1) bars assumption of the Contracts because the Anti-Assignment Act (41 U.S.C. § 6305) is an "applicable law" that excuses the Fund from accepting performance from any party other than Minesen:

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 9 of 57

The party to whom the Federal Government gives a contract or order may not transfer the contract or order, or any interest in the contract or order, to another party. A purported transfer in violation of this subsection annuls the contract or order so far as the Federal Government is concerned, except that all rights of action for breach of contract are reserved to the Federal Government.

41 U.S.C.A. § 6305(a).

It does not matter that Minesen intends to assume the Contracts and keep them rather than assign them to another party. The Ninth Circuit applies the so-called "hypothetical test" to § 365(c)(1): a debtor may not assume a contract if it could not assign that contract to a third party, even if the debtor does not actually propose to assign the contract. *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 F.3d 747, 750 (9th Cir. 1999).

The Anti-Assignment Act is an "applicable law" under § 365(c)(1). *United States v. TechDyn Systems Corp. (In re TechDyn Systems Corp.)*, 235 B.R. 857 (Bankr. E.D. Va. 1999) (holding that the debtor could not assume a contract under which the debtor maintained and repaired telecommunications networks on military bases); *In re Plum Run Service*

10

*Corp.*, 159 B.R. 496, 500-01 (Bankr. S.D. Ohio (1993) (holding that the debtor could not assume a contract to provide maintenance services at the Guantanamo Bay naval base).

Minesen argues that the Anti-Assignment Act does not apply because the MWR Contract says that the United States government is not a party to it. The definition of "Government" states that "The [United States] Government is not a party to this contract . . . ." (Ex. M-1 at M-10008.) But this language cannot be read in isolation. The rest of that very sentence reads: "and no funds appropriated by Congress are in any way obligated or can be obligated by virtue of any provision of this contract." *Id*. Similar language appears just above the parties' signatures: "NO FUNDS OF THE UNITED STATES GOVERNMENT WILL BE PAID OR BE DUE TO THE CONTRACTOR BY VIRTUE OF THIS CONTRACT." (Ex. M-1 at M-10002.) Read in context, the first part of the sentence defining "Government" was intended only to reinforce the point that, if Minesen were entitled to any payment or recovery under the MWR Contract, the company could look only to the Fund, and not to the United States government in general.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 11 of 57

Other provisions of the MWR Contract make clear that the Fund is part of the United States government. The definition of the Fund says that it is "a nonappropriated fund *instrumentality* (NAFI) *of the United States*. . ." (Ex. M-1 at M-10008, emphasis added.) Virtually identical language appears in the preamble of the MWR Contract. (Ex. M-1 at M-10002.) Section I, paragraph 1 of the MWR Contract provides that the Fund is exercising authority delegated to it by the Secretary of the Army. (Ex. M-1 at M-10007.) As an instrumentality of the government and a delegee of powers from a cabinet member, the Fund is part of the federal government.

The Fund's status as a NAFI is significant. "NAFIs are federal government entities whose monies do not come from congressional appropriation but rather primarily from [their] own activities, services, and product sales." *Minesen Co. v. McHugh*, 671 F.3d 1332, 1336 (Fed. Cir. 2012) (cleaned up). The Supreme Court has held that military post exchanges, which are the paradigm of a NAFI, "as now operated are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling

12

the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes." *Standard Oil Co. of California v. Johnson*, 316 U.S. 481, 485 (1942). This is true even though "[t]he government assumes none of the financial obligations of the exchange." *Id.* In short, a NAFI is part of the government, even though the government is not liable for its obligations.

Thus, the MWR Contract is covered by the Anti-Assignment Act despite the language cited by Minesen. But even if the MWR Contract were not covered, the Lease and Picnic Area Lease are undoubtedly government contracts because the "United States of America" is the named lessor. (Ex. M-3 at 10078; Ex. M-5 at 10095.) The same is true of the Operating Agreement because elements of the Department of the Army are parties to it. (Ex. M-4 at M-10090.) The MWR Contract depends on the leases and the Operating Agreement; it would make no sense to assume the MWR Contract if Minesen could not also assume the Lease, the Picnic Area Lease, and the Operating Agreement.

But the government can waive the benefits of the Anti-Assignment Act.

13

*Tuftco Corp. v. United States*, 614 F.2d 740, 745 (Ct. Cl. 1980) ("Consistent with the situations in which the Anti-Assignment Act has been deemed inapplicable stands the long-recognized principle that [d]espite the bar of the Anti-Assignment statute (41 U.S.C. § 15), the Government, if it chooses to do so, may recognize an assignment.") (cleaned up). Waiver is usually based on the government's acceptance of or acquiescence to a specific assignment. *Id*. But a prospective waiver is also enforceable: if the contract permits assignments, the government must honor those provisions and cannot hide behind the Anti-Assignment Act. *See, e.g., Liberty Ammunition, Inc. v. United States*, 101 Fed. Cl. 581, 588 (2011) (holding that a contractual provision authorizing assignments to an entity completely owned and controlled by a contracting party, or as part of a transfer of all or substantially all of a contracting party's assets, potentially waived the Anti-Assignment Act).

The MWR Contract provides that Minesen may not assign or novate the contract without the Fund's written consent. But it also provides that "such consent will not be unreasonably withheld." (Ex. M-1 at M-10020.) When the Fund agreed to limit its power to reject assignments, it waived the

14

protections of the Anti-Assignment Act.

Therefore, § 365(c) does not prevent assumption of the Contracts.

**C.    Minesen's Alleged Defaults**

*1.    __Notice of defaults__*

Minesen argues that the Fund has not given it notices to cure certain defaults and that it need not cure those defaults as a condition to assumption of the Contracts. I disagree.

Section 365 provides that a debtor in possession must cure all defaults under the assumed contract or lease. To determine whether the debtor is in "default" and what constitutes a "cure," one must look to the terms of the contract.[5]

---

[5] *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1361 n.4 (9th Cir. 1983) ("Although whether a given contract is 'executory' under the Bankruptcy Act is an issue of federal law . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law . . . a bankruptcy court should determine whether one of the parties' failure to perform its remaining obligations would give rise to a "material breach" excusing performance by other party under the contract law applicable to the contract under the choice of law rules of the state in which the court sits"). Under Hawaii law, "breach of contract" and "default" mean a failure to perform a legal or contractual duty or any promise which forms the whole or part of a contract, and a "material breach" is one that is "so substantial and fundamental as to defeat the object of the parties in making the agreement." *Aickin v. Ocean View Investments Co., Inc.*, 84 Hawai'i 447, 457 n.16, 460 (Haw. 1997).

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 15 of 57

The MWR Contract requires Minesen to perform various obligations. In most cases, Minesen must do those things without waiting for the Fund to tell it to do them. The MWR Contract requires the Fund to give notices, not as a precondition to Minesen's obligation to perform its obligations, but rather as a precondition to its exercise of remedies after Minesen defaults. In other words, the Fund's failure to give notice of default does not excuse Minesen's obligation to perform under the Contracts.

Minesen argues that case law provides that the Fund is barred from asserting any default for which it did not give pre-petition notice. However, the case law does not support Minesen's argument. Those cases provide clearly that post-petition notice is sufficient. For example, in *In re Rachels Indus., Inc.,* where Article 10 of the lease in question provided that a default under the lease existed only if there was no cure within thirty days of receipt of notice, the court determined that notice provided not only post-petition, but also after the filing of the motion to assume, was sufficient. 109 B.R. at 811-812 (W.D. Tenn. 1990).

Therefore, the Fund's failure to give cure or termination notices pre-

16

petition has no bearing on Minesen's obligation to cure a proven default under § 365.

### 2. _Involvement of other Army institutions_

Minesen suggests that it need not cure certain defaults because it owes performance to entities other than the Fund. For example, Minesen points out that it pays electrical charges to the garrison's Department of Public Works ("DPW"), and not to the Fund. I reject this argument for two reasons.

First, the Fund, DPW, the Schofield Barracks garrison, the other affected Army agencies and institutions, and indeed the Army itself, are all instrumentalities of the federal government. Minesen's performance nominally owed to the Fund, the DPW, and the other organizations is really owed to the United States. The fact that the government has created various internal organizations to carry out its functions does not change Minesen's obligations under the Contracts.

Second, even if DPW (for example) were truly separate from the Fund, it would not matter. Section 365 requires Minesen to cure its material defaults under the Contracts. If the Contracts require Minesen to render

17

performance to third parties and Minesen fails to perform, Minesen is in default under the Contracts, and it cannot assume the Contracts without curing those defaults.

### 3. *Nonpayment for electricity*

Paragraph 24 of the Lease requires Minesen to

> pay the cost, as determined by the [garrison command] of producing and/or supplying any utilities and other services furnished by the Government or through Government-owned facilities for the use of [Minesen], including [Minesen's] proportionate share of the cost of operation and maintenance of the Government-owned facilities by which such utilities or services are provided or supplied. Payment shall be made in the method prescribed by the said Officer, upon bills rendered monthly.

Paragraph 5b(3) of the Operating Agreement requires the garrison command to "provide appropriate utilities to the Inn on a reimbursable basis. Invoices shall be provided to [Minesen] on a monthly basis." Pursuant to paragraph 5c(5), Minesen agreed to "promptly settle utility charges upon verification of accuracy."

The Fund contends that Minesen has breached the agreements by failing to pay electrical charges amounting to $561,538.89 through June 2021

18

plus additional amounts for subsequent months. Minesen denies that it owes this amount on three grounds.

First, Minesen argues that it did not receive monthly bills as the contracts require. I find that Minesen usually received bills (which the garrison calls "statements of account") monthly, but that sometimes it received statements more or less often than that. I find, however, that any delay or irregularity in sending statements to Minesen does not excuse Minesen's obligation to pay for electricity under the Contracts.

Second, Minesen argues that the amounts billed are questionable because they vary from month to month in inexplicable ways. Mr. Jensen testified that the Inn's electricity consumption depends on occupancy, and that the variation in the electric bills does not correlate with changes in occupancy. Therefore, Minesen has paid for electricity based on a formula that Mr. Jensen devised, rather than the bills.

But the Fund established that the electric bills can vary even if occupancy does not. The Fund's witnesses credibly testified that variations in the bills were partly attributable to changes in the rates billed by the

U.S. Bankruptcy Court - Hawaii  #19-00849  Dkt # 505  Filed 11/17/21  Page 19 of 57

electric utility that furnishes power to the Schofield Barracks installation and partly to the fact that the billing periods were sometimes longer or shorter than a calendar month. The bills in evidence bear this out: total electrical usage varies seasonally and is generally highest in the summer, when air conditioning usage peaks, and the rate charged for electricity by the utility varies from month to month. The Fund also proved that the Inn consumes electricity, not just for guest rooms, but also for the office, convenience store, and laundry room. (The laundry room is heavily used, not only by guests at the Inn, but by other members of the garrison community, because it is the only public laundry facility at Schofield Barracks.) For these reasons, it is not surprising that electricity usage does not exactly track occupancy.

Most importantly, Minesen offered only suspicions, and no evidence, that the bills were wrong. The electric meter that measures power supplied to the Inn was installed recently (in 2017) and Minesen offered no evidence that it is inaccurate or unreliable. I find that the electricity billings are accurate.

Third, Minesen argues that DPW prevented it from verifying the

20

accuracy of the bills. Prior to 2017, Minesen was able to read the meter itself, whenever it chose to do so. In 2017, DPW placed a locked cover on the electric meter to protect it from the elements and passers-by. This made it impossible for Minesen to read the meter at times of its choosing. I find that the garrison has informed Minesen whenever DPW plans to read the meter and has invited Minesen to look at the meter at those times, but Minesen did not always take that opportunity. (Ex. M-65 at M-11429.) Minesen offered no evidence that DPW's personnel have read the meter incorrectly. Minesen wants to read the meter daily but has not convincingly explained why such frequent readings are necessary to verify the electric charges. Minesen also wants to install its own submeter, but Minesen has not explained why its submeter would be more accurate than DPW's or what the parties should do if the submeter produced different readings than DPW's meter. I find that Minesen has had an ample opportunity to verify the electricity charges and that Minesen is obligated to settle the charges immediately.

Fourth, there is a dispute about whether Minesen must pay for utilities in advance or in arrears. Until about 2017, the garrison billed Minesen for

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed   11/17/21   Page 21 of 57

electricity in arrears, after Minesen had consumed the electricity. In or around 2017, Army regulations changed to require non-federal customers to pay for an entire year's estimated utility charges in advance. Annual payment is inconsistent with the MWR Contract; that contract does not explicitly provide for payment in arrears, but that had been the parties' practice for over twenty years. Eventually, Minesen and the garrison agreed that the garrison would bill Minesen for one month's estimated utility charges in advance, subject to a periodic "true up" to match the estimated bills to actual consumption. Although the parties never reduced this agreement to a signed writing, both parties are apparently content with it, so it should continue unless and until the parties agree to a further modification of the MWR Contract and the Operating Agreement.

I find that Minesen is in default under the Contracts for failure to pay electric bills and that Minesen owes $561,538.89 through June 2021 plus additional amounts charged for subsequent months.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 22 of 57

4. *Sale of alcoholic beverages*

   (a) *Distilled spirits*

Section I, paragraph 26 of the MWR Contract provides that Minesen "shall not sell, store, dispense, or knowingly permit the sale, storage or dispensing of any distilled spirits" at the Inn.

Despite this flat prohibition, Minesen has admittedly sold distilled spirits at the Inn for many years, with only a few recent breaks. Minesen attempts to justify this in two ways.

First, Minesen relies on section I, paragraph 4a of the MWR Contract, which requires Minesen to operate and maintain "a limited-service hotel with normal services and amenities. . ." Minesen says that selling minibottles of liquor is a "normal amenity" of a limited-service hotel. This argument fails. It is an elementary rule of contract interpretation that specific provisions control general provisions. *See, e.g., Shivkov v. Artex Risk Solutions, Inc.*, 974 F.3d 1051, 1063 (9th Cir. 2020) ("It is a standard rule of contract interpretation that specific terms control over general ones.") (internal citations omitted); *Kaiser Hawaii Kai Development Co. v. Murray*, 49 Haw. 214,

23

228 (Haw. 1966) ("in case of inconsistency between general and specific provisions, the specific controls the general."). The general statement about "amenities" does not trump the specific prohibition of "distilled spirits."

Second, Minesen offered evidence that the Fund and the garrison command did not object to Minesen's liquor sales until 2016, although Minesen had sold liquor for many years before that. Minesen says that this history means that it did not breach the Contracts by selling distilled spirits. Minesen did not prove, however, that there was either a waiver or an oral modification of the distilled spirits provision. There was no persuasive evidence that the Fund or the garrison command knew, prior to 2016, that MWR was selling alcohol or that either the Fund or the garrison command agreed to modify the distilled spirits provision at any time. Therefore, the MWR Contract still prohibits Minesen from selling distilled spirits, and Minesen's sales of distilled spirits were breaches of that contract.

### (b) *Beer and wine.*

Minesen has also sold beer and wine at the Inn. Beer and wine are not

U.S. Bankruptcy Court - Hawaii  #19-00849  Dkt # 505  Filed  11/17/21  Page 24 of 57

"distilled spirits," but other provisions of the Contracts come into play.[6]

Section I, paragraph 10.h of the MWR Contract requires Minesen to "adhere to all applicable Federal, State, and local laws, codes, ordinances, and regulations pertaining to the construction, operation, use, repair, and maintenance of the [Inn]. If a conflict occurs between the provisions of this contract and the applicable Federal, State, and local laws the latter shall prevail." Similarly, paragraph 11 of the Lease requires Minesen to "comply with all applicable laws, ordinances, and regulations of the Government, of the state, county, and municipality wherein the [Inn] is located, with regard to . . . licenses . . . and all other matters."

Reinforcing these provisions, section I, paragraph 32 of the MWR Contract says that "the leased premises are presently subject to concurrent jurisdiction," meaning that the Schofield Barracks garrison is subject, not only to federal law and the Army's regulations, but also to state and local

---

[6] Section 19(a) of the Picnic Area Lease provides that Minesen "shall not sell, store or dispense, or permit the sale, storage, or dispensing of beer or other intoxicating liquors on the premises." Because the liquor sales were made at the convenience store rather than within the picnic area, Minesen is not in breach of the Picnic Area Lease.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed 11/17/21   Page 25 of 57

law. This provision recognizes that, under § 16(b) of the Admissions Act, the federal and Hawaii state governments have concurrent legislative jurisdiction over military bases existing at the time of Hawaii's admission to the union, unless Congress legislates otherwise. *See Kalaka Nui, Inc. v. Actus Lend Lease, LLC*, Civ. No. 08-00308 SOM/LEK, 2009 WL 1227892, at *5 (D. Haw. May 5, 2009) ("The Admission Act [Pub.L. No. 86–3, 73 Stat. 4, 11–12 (March 18, 1959)] clearly provides that Hawaii has concurrent jurisdiction over such military bases [Hickam Air Force Base] so long as state jurisdiction is consistent with post-Admission Act laws enacted by the United States Congress."); *State v. Thomas*, 8 Haw. App. 497, 504, 810 P.2d 668, 672 (1991) ("Absent a concrete pronouncement by the federal government that it desires or requires exclusive jurisdiction over the land at Iroquois Point, we must give effect to the concurrent jurisdiction established by § 16(b) [of the Admissions Act].") I take judicial notice that Schofield Barracks was a military installation when Hawaii became a state. No Congressional legislation limits the concurrent jurisdiction of the state and local

governments over Schofield Barracks.[7]

Therefore, the Contracts require Minesen to comply with any applicable State, county, and local laws, including liquor licensing laws.

Hawaii law provides that, with limited exceptions not applicable here, one must have a license issued by the county to sell "liquor," Haw. Rev. Stat. §§ 281-101, 101.4, which includes distilled spirits, beer, and wine, *id.* § 281-1. The statute does not exclude sales of liquor on military bases. The MWR Contract makes Minesen, "responsible for obtaining any necessary licenses. . . ." (M-1 at M-1011.)

Minesen does not have a liquor license, so its sales of alcoholic beverages are defaults under the Contracts.[8]

_____

[7] *Jack's Tours, Inc. v. Kilauea Military Camp,* 112 Hawaii 150 (2006), is not to the contrary. In that case, a private bus operator argued that Kilauea Military Camp, a NAFI, could not offer bus tours without obtaining a license from the state's Public Utilities Commission. Kilauea Military Camp argued that, as an arm of the federal government that Congress had not subjected to state law, it was immune from state regulation. The Hawaii Supreme Court agreed. But the liquor license requirement in this case does not fall on the Fund; rather, it falls on Minesen, and Minesen lacks governmental immunity and has expressly agreed to comply with state and local law.

[8] Mr. Jensen testified that the Honolulu Liquor Commission told Minesen that the commission was not concerned with liquor sales on military bases. There is no evidence of who made this statement, whether that person knew all relevant facts, or that the person was authorized to bind the commission.

27

### 5. *Reports*

Section 1, paragraph 16 of the MWR Contract, as amended by Modification No. P00018, requires Minesen to provide the Fund with three sets of financial reports: (1) "annual operating, capital expenditure and cash flow budget projections, no later than 30 days prior to the beginning of the calendar year"; (2) "monthly financials of the [Inn] that are in conformance with generally accepted accounting principles and the most current edition of the Uniform System of Accounts for Lodging . . . . within 20 calendar days following the reporting period"; and (3) "compilation report accompanied with the compiled financial statements or Independent Accountant's Review Report within 90 calendar days following the calendar year. . ." (M-2 at M-10073.)

Minesen contends that it has produced all required reports, that if any are missing it can provide them promptly, and that any tardiness in providing the reports is immaterial. But the Fund points out, and Minesen does not deny, that some of the reports do not comply with GAAP. (M-48.)

The evidence at trial was not sufficient to establish whether and to

what extent Minesen is in default in this respect.

### 6. *Pangolin Management Agreement*

Section I, paragraph 45 of the MWR Contract provides that, within 7 days after awarding a "subcontract," Minesen must deliver to the Fund a statement naming the subcontractor and describing the subcontractor's work.

In 2014, Minesen and Pangolin entered into a management agreement, pursuant to which Pangolin agreed to manage the Inn. Pangolin is wholly owned by Max Jensen, who also owns 95% of Minesen's stock.[9]

Pangolin is a "subcontractor" of Minesen within the ordinary meaning of that word because Pangolin agreed to do some of the things that Minesen was obligated to do under the MWR Contract. (I am not convinced by Minesen's argument that the provision applies only to construction subcontractors; the placement of the provision within the agreement does

---

[9] Minesen claims that its former lender, First Hawaiian Bank, insisted that Minesen enter into a management agreement. I do not credit the testimony in support of this contention, but it is irrelevant. Minesen must comply with the MWR Contract no matter what First Hawaiian Bank told it to do.

not override its plain words.) Minesen did not timely deliver the required statement to the Fund (although some of the financial reports it provided to the Fund disclosed payments to Pangolin).[10]

But Minesen's failure to comply with this provision of the MWR Contract did not injure the Fund. The MWR Contract only requires Minesen to give the Fund after-the-fact notice of a subcontractor and does not give the Fund any approval rights. The Fund would have had no additional rights, and here is no evidence that the Fund would have behaved differently, if Minesen had given timely and proper notice. I find this breach was immaterial and need not be cured.

### 7. _Pangolin Indebtedness_

Section 1, paragraph 20 of the MWR Contract provides that "[t]he Fund reserves the right to approve any initial and future financing of the [Inn], including the refinancing of any loans, however, approval will not be

_____

[10] Minesen also argues that a consent document signed by the Fund confirms that the Fund received a copy of the management agreement. That document (Ex M-43 at M-10911) says no such thing. Rather, it says that the fund "acknowledge[s] receiving copies of the Mortgage, the promissory note, the loan document, and other documents evidencing and governing the loan;" it does not say that the Fund received all of the loan documents, and never mentions the management agreement.

unreasonably withheld." (M-1 at M-10015.)

In 2014, Minesen borrowed $10,600,000 from First Hawaiian Bank. The loan was secured by mortgages of the Leases and security interests in Minesen's interest in the MWR Contract and the RRA (described in the next section). Max Jensen personally guaranteed the loan. The Fund consented to these mortgages and security interests, acknowledged that Minesen was not then in default, and agreed to give notices of default to First Hawaiian Bank. (Ex. M-43 at M-10910.)[11]

In 2018, the Fund sent Minesen multiple notices of defaults under the MWR Contract. The Fund sent copies of these notices to First Hawaiian Bank as it had agreed. In May and June 2018, First Hawaiian Bank notified Minesen and Mr. Jensen that Minesen's defaults under the MWR Contract were also defaults under the loan. First Hawaiian Bank demanded that Minesen either cure its defaults under the MWR Contract or pay off the loan in full. Minesen and Mr. Jensen elected to have Pangolin pay off First

---

[11] First Hawaiian Bank also took a collateral assignment of the Pangolin management agreement. The written consent signed by the Fund (Ex. 43) does not mention this document.

Hawaiian Bank. Minesen and Pangolin (but not First Hawaiian Bank or the Fund) then signed an agreement stating that Pangolin would be "subrogated" to First Hawaiian Bank's rights.

I find that the term "refinancing," as used in the MWR Contract, is ambiguous, in that one can reasonably read it to include or exclude the transaction in which Pangolin repaid the First Hawaiian Bank debt. I further find that, in the context of the MWR Contract, the term "refinancing" includes that transaction. The Fund has a compelling interest in Minesen's financial condition. Minesen provides an important service to the Fund's constituency (soldiers and their families) often at a challenging time in their lives (while they are moving from one home to another). The Fund has a good reason to monitor Minesen's financial ability to provide this service. The MWR Contract requires Minesen to provide these services at below-market rates, which increases the financial risk of Minesen's operation. For these reasons, the MWR Contract requires Minesen to keep the Fund informed of the details of its finances and operations. For the same reasons, the term "refinancing" should be given a broad meaning, to preserve the

32

Fund's oversight of Minesen's finances. The Fund has good reason to want to know whether a lender of which it has approved has been replaced by another lender, and, more specifically, whether an insider "lender" has replaced an independent financial institution.

In addition, the legal consequences of the Pangolin transaction should hinge on its substance rather than its form. If Pangolin had lent money to Minesen (on exactly the same terms as the First Hawaiian Bank loan) and Minesen had used that money to repay First Hawaiian Bank, all parties would agree that a "refinancing" had occurred. The only difference between that hypothetical case and this case is that Pangolin paid the money directly to First Hawaiian Bank rather than routing it through Minesen. Because the result of both scenarios is the same (Pangolin's money paid off Minesen's debt to First Hawaiian Bank), the legal consequences should also be the same.

Thus, the Pangolin "subrogation" transaction[12] was a "refinancing" to

---

[12] It is not clear that subrogation is legally available. Under Hawaii law, the subrogation doctrine "is not to be applied in favor of one who has officiously, and as a mere volunteer, paid the debt of another, for which neither he nor his property was under any obligation

which the Fund did not consent. If Minesen had asked for the Fund's

consent, the Fund could reasonably have withheld consent because at that

time Minesen was in default under the MWR Contract and was facing

imminent termination.

### 8.   *Replacement Reserve Account*

Section I, paragraph 12 of the MWR Contract provides that Minesen

"shall maintain a replacement reserve account ("RRA") into which will be

deposited four (4) percent of gross revenues." The funds in the RRA "shall

be used for the planned renovations, major repairs, and replacement of the

facilities[,] furnishings, fixtures, interior and exterior finishes, and other

component [sic]."

The MWR Contract does not expressly define the "planned

renovations, major repairs, and replacement[s]," but other provisions

---

to pay; and it is not allowed where it works any injustice to the rights of others." *Alamida v. Wilson*, 53 Haw. 398, 403 (1972). Pangolin was not indebted to First Hawaiian Bank and using subrogation to circumvent the Fund's approval rights would be unjust to the Fund. Further, First Hawaiian Bank released its mortgages and security interests. Minesen does not explain how Pangolin could resurrect those rights in the face of the strong arm power under § 544(a).

contemplate that the plans would require mutual agreement of the Fund and Minesen. Section I, paragraph 13 provides that "Planning for the upgrades and/or renovations of the [Inn] will occur at a minimum of every three years. The [Fund's] Contracting Officer … will jointly with Minesen approve all capital expense plans." Section I, paragraph 12 provides that, when the MWR Contract terminates, any funds remaining in the RRA "shall first be applied to the planned renovations, major repairs and replacement of the property and those items identified since the most recent renovation plan was developed that the Fund and [Minesen] mutually agree require repair or replacement."

Minesen has not deposited four percent of its gross revenues in an RRA. This is a breach of the MWR Contract.

Minesen argues that it is not in default, or that its default is excused, because Minesen has spent at least four percent of its gross revenues on "renovations, repairs and replacements, and their maintenance." (ECF 289-1 at 16-17.) This argument is unavailing.

First, I find that Minesen did not prove that the parties waived or

35

orally modified the RRA provisions of the MWR Contract. Although Minesen's financial reports to the Fund disclosed expenditures for repairs, there is no evidence that Minesen disclosed to the Fund that it was making the kinds of "renovations, *major* repairs, and replacements" for which the RRA was intended.

Second, the MWR Contract does not permit Minesen to decide unilaterally on these expenses. On the contrary, the MWR Contract contemplates that the Fund and Minesen must agree on expenditures of this type.

Third, even if Minesen had the unilateral power to decide on these expenses, it has not provided enough evidence to prove that its expenditures were for "renovations, major repairs, and replacements," as opposed to ordinary maintenance and less-than-major repairs. For example, Minesen claims credit against the RRA deposit obligation for "internet expenses," "office supplies," "software/hardware & training/travel expense," and the like.

Fourth, Minesen's failure to deposit money in the RRA frustrates the

36

provision of the MWR Contract that money in the RRA upon termination will be used to complete ongoing or planned renovations before any excess funds are released to Minesen. If Minesen does not make deposits as required, MWR would have to use its own funds for that purpose. By keeping money in its own accounts rather than funding the RRA, Minesen has frustrated this provision.

The evidence does not establish the total shortfall in the RRA deposits. For 2018, the amount was $397,564.52. The Fund offered reports showing the amounts for other years, but I declined to receive them in evidence because the Fund did not timely produce them.

### 9.  *Room overcharges*

Section I, paragraph 14 specifies the room rates that Minesen was initially allowed to charge. Paragraph 15 provides for adjustments of the room rates and provides that, "[a]ny agreed upon rate changes shall be made effective the first day of the second month after approval by written modification to this contract and signed by both parties." The same paragraph also provides that "[t]he room rates shall not exceed the

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 37 of 57

maximum lodging portion of the transient lodging allowance (TLA),"

meaning the lodging costs for which the government reimburses military

travelers.

In August 2015, Minesen requested a room rate adjustment. In early

2016, the parties agreed on a rate sheet with one change left to make.

Although the parties had not signed a contract modification, Minesen began

charging the new, higher rates.

The Fund sent a written modification of the MWR Contract to Mr.

Jensen for execution. He did not sign it because he thought it was incorrect.

The Fund prepared and transmitted more versions of the modification, but

Mr. Jensen still failed to sign.

The early versions of the modification specified that it would go into

effect on March 1, 2016. This effective date was itself a modification of the

MWR Contract, which provided that rate changes would go into effect *after*

the parties signed a written contract modification. When Mr. Jensen refused

to sign for three years, however, the Fund was no longer willing to make this

concession. Accordingly, the Fund transmitted another version of the

38

modification document that said it would go into effect upon execution. Mr. Jensen eventually signed this version on May 29, 2019. By then, Minesen had been charging the higher rates for over three years. This is a default under the MWR Contract.

The total amount that Minesen charged to guests in excess of the approved room rates is $1,097,438.95. In addition, Minesen charged guests a total of $9,027 in excess of the maximum lodging portion of the transient lodging allowance.

Minesen attempts to avoid the consequences of its breach in several ways.

First, it claims that the Fund orally approved the rates in 2016, before Minesen began charging them. The Fund's contracting officer denies this. I credit the contracting officer's testimony, partly because Minesen's contention is inconsistent with Mr. Jensen's testimony that the initial versions of the written contract modification were wrong. This means that the Fund and Minesen did not have a meeting of the minds at that point. I find that the Fund never agreed to waive or modify the contract provisions

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed 11/17/21   Page 39 of 57

requiring that all modifications be set forth in signed writings.

Second, Minesen claims that the Fund lacks standing to raise this issue. Minesen reasons that only the soldiers who paid Minesen's room rates could have been hurt by overcharges, and they were not hurt because Minesen's rates were always less than the per diem travel reimbursements to which soldiers were entitled. This argument ignores the fact that the Army reimburses official travelers for their *actual* lodging expenses up to the maximum per diem allowance. According to the military's Joint Travel Regulations ("JTR"), "The calculation of per diem allowances for each travel day is based on the *actual amount paid for lodging, limited to the lodging portion of the locality per diem rate,* plus the applicable meal rate and incidental expense (M&IE) rate, unless otherwise stated in the JTR."[13] Therefore, the government paid soldiers more than it should have paid because Minesen charged soldiers more than the approved rates under the MWR Contract. Moreover, as described above, § 365 does not distinguish between a breach

---

[13] The Joint Travel Regulations (JTR): Uniformed Service Members and DOD Civilian Employees (November 1, 2021), defensetravel.dod.mil/Docs/perdiem/JTR.pdf at 2-25 (emphasis added).

against the nondebtor contracting party and one against a third party. Instead, if there is any material breach, the debtor must demonstrate it has cured it or provide adequate assurance.

Third, Minesen claims that the Fund released the overcharge claims in the 2017 settlement agreement. This is false. That agreement does not include a general release of all claims. Rather, the Fund released Minesen of all claims "arising under" certain identified ASBCA appeals. (Ex. M-6 at M-10123.) The recitals to the settlement agreement make clear that those appeals relate solely to the Inn's status as "government quarters." (*See* section III.D.1 below.) Those appeals had nothing to do with the maximum room rates under the MWR Contract. Therefore, the release does not apply.

Fourth, Minesen argues that, if the Fund is right that the Inn is no longer "government quarters" due to the 2017 settlement agreement, then the Fund has no right to limit Minesen's room rates. The MWR Contract does not support this agreement. The Government Quarters Provision of the MWR Contract (discussed in section III.D.1 below) is separate from and independent of the room rates provision. Deleting the Government Quarters

41

Provision had no effect on the room rates provision. Minesen surely wishes it could set its own rates, but it gave up that right when it signed the MWR Contract and did not regain that right when it signed the 2017 settlement agreement.

### 10. _Name change_

In or around 2018, Minesin began to advertise the Inn as the "Sunrise Inn." This was in breach of Section I, paragraph 8 of the MWR Contract, which provides that the Fund would select the name of the Inn with Minesin's approval. The Fund did not select or approve the "Sunrise Inn" name. Minesen eventually stopped using the Sunrise Inn name, so the default has been cured. There is no evidence that the name change injured the Fund.

### D. The Business Judgment Test

Minesen's decision to assume the Contracts is a reasonable exercise of its business judgment and assumption of the Contracts is undoubtedly in the best interest of the bankruptcy estate. Minesen has operated the Inn at a substantial profit for many years and will likely generate substantial

42

additional profits from operating the Inn during the remaining term of the MWR Contract. This will be true even after Minesen cures the defaults identified above.

### 1. *Statements of non-availability*

The parties have argued at length about whether the Fund has wrongfully refused to allow Minesen to offer so-called statements of nonavailability, or SNAs. Neither party has explained, however, exactly how that question is legally relevant to assumption of the Contracts. I assume that Minesen contends that the Fund has breached the contract and that its own breaches are, therefore, excused.

Further, the issue is relevant to whether Minesen has exercised proper business judgment in deciding to assume the agreements. Minesen says that the right to issue SNAs is a key component of its business model. This argument is disingenuous. Minesen's evidence shows that it has operated the Inn profitably even after its right to issue SNAs was withdrawn. Minesen's cash on hand has increased from about $700,000 on the date of the chapter 11 petition to over $5 million at the end of February 2021. (ECF 319 at

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 43 of 57

6.) In Minesen's own words, Minesen "can clearly operate the Inn at a profit, even though [sic] an unprecedented pandemic that wreaked havoc on hotels in Hawaii." *Id.* "In fact, the evidence has shown that Minesen has had excellent performance during the Summer of 2021." (ECF 492 at 5.) Minesen does not attempt to reconcile its boasts about its recent financial performance with its laments about the loss of the SNAs.

Originally, the MWR Contract gave official travelers a powerful financial incentive to stay at the Inn. Section I, paragraph 7 of the MWR Contract (the "Government Quarters Provision") states:

> TLF DEFINED AS GOVERNMENT QUARTERS. The completed TLF will fall within the current Joint Federal Travel Regulation definition of government quarters, if its use is directed in accordance with the regulation of the military service concerned. The Joint Federal Travel Regulation and any definition contained therein is subject to change at any time. Travelers receiving government per diem payment, in order not to forfeit their per diem entitlement, will be required to patronize the TLF on a mandatory basis as long as confirmed reservation priorities are in accordance with those provided at Section III, Operation Requirements.

Section 5b(7) of the 1994 Operating Agreement reinforced section 7 of the MWR Contract by requiring the Schofield Barracks garrison command to

44

[r]efer all Schofield Barracks official travelers to the Inn at Schofield Barracks for assignment of quarters. The Inn is considered Government quarters in accordance with the Joint Federal Travel Regulation, Appendix A, definition of Government quarters, subparagraph 6. Personnel on official travel who are authorized use of the Inn will not be issued statements of non-availability unless the Inn is at maximum capacity.

The Government Quarters Provision benefitted Minesen by giving it a captive market: in order to obtain any reimbursement for their lodging costs, official military travelers had to stay at the Inn (unless it was full).

In practice, the Government Quarters Provision required a servicemember to seek a reservation at the Inn. If the Inn were full for the servicemember's dates of stay, the Inn issued an SNA stating that lodging at the Inn was unavailable. With an SNA, the servicemember could stay in other lodgings and still obtain reimbursement.

In or around 1997, the Joint Federal Travel Regulations (now called the Joint Travel Regulations, or "**JTR**") were changed to allow soldiers to use their per diem allotment to stay at any hotel, regardless of whether government quarters were available. This reduced travelers' incentives to stay at the Inn. It did not eliminate those incentives, however: the Inn is

located on the Schofield Barracks installation, close to servicemembers'
places of work and schools for their children; and there are no other hotels in
the immediate vicinity.

In 1999, Minesen asserted a claim against the Fund for breach of
contract, damages, and other relief relating to this change in the JTR. The
Fund denied the claim and Minesen appealed to the Armed Services Board
of Contract Appeals ("**ASBCA**").

After almost seven years of contentious litigation, the ASBCA
determined in 2006 that the Fund had breached the MWR Contract by
acquiescing to the change to the JTR. Appeals of -- Minesen Co., 2007-1
B.C.A. (CCH) P33,456, 165856, 2006 ASBCA LEXIS 101, *203 (A.S.B.C.A.
November 20, 2006). The ASBCA left the determination of damages for
further proceedings.

After another decade of litigation, Minesen and the Fund entered into a
settlement agreement dated April 28, 2017. (Ex. M-6.) The Fund agreed to
pay Minesen $8,375,000.00 (in addition to prior payments totaling
$893,025.00) "for any additional past lost profits and any anticipatory lost

profits due to [the Fund's] breach through the expiration of the contract."[14] The parties also agreed to modify the MWR Contract by (among other things) deleting the Government Quarters Provision, and they agreed that the deletion of that paragraph from the MWR Contract "voided" paragraph 5b(7) of the Operating Agreement. Also on April 28, 2017, the Fund and Debtor executed the Modification Agreement, which formally incorporated the changes required by the Settlement Agreement into the MWR Contract.

The Fund contends that the deletion of the Government Quarters Provision from the MWR Contract and the corresponding change to the Operating Agreement meant that official military travelers could obtain maximum reimbursement if they stayed at another hotel, even if they did not have an SNA for the Inn. Minesen argues that SNAs were required even after these changes. For the following reasons, I agree with the Fund's position and reject Minesen's position on this issue.

First, the plain language of the Settlement Agreement is consistent with

_____

[14] Minesen evidently did not need the money to sustain its operations. "The proceeds of settlement were $8,375,000 which were promptly distributed to [Minesen's] shareholder." (Ex. M-14 at M-10289.)

the Fund's position and cannot be reconciled with Minesen's position. If Minesen's position were correct, the deletion of the Government Quarters Provision would have been a meaningless gesture. The parties would not have agreed to that change unless it meant something, and the obvious meaning of the change is that the Inn would no longer be treated as "government quarters."

Second, other terms of the Settlement Agreement contradict Minesen's position. The Settlement Agreement provides that the Fund's payment was meant to compensate Minesen, not only for past lost profits, but also for "any anticipatory lost profits due to [the Fund's] breach through the expiration of the [MWR] Contract." If Minesen were entitled to issue SNAs after the Settlement Agreement, there could not have been any "lost future profits" due to the absence of SNAs.

Third, Max Jensen testified at trial that, during the meeting that led to the Settlement Agreement, Jennifer Sherman (who was and is the Fund's contracting officer with authority over the MWR Contract) orally assured him that Minesen would still control the SNAs after the Settlement

48

Agreement. Ms. Sherman testified that she said no such thing. Mr. Jensen's testimony is extrinsic evidence contradicting the plain meaning of the integrated Settlement Agreement; his testimony is inadmissible under the parol evidence rule.[15] Even if Mr. Jensen's testimony were admissible, I find Ms. Sherman's testimony on this point more credible than his. I do not believe that Ms. Sherman told Mr. Jensen that the changes to the MWR Contract and the Operating Agreement were meaningless. I find that Ms. Sherman did not give such an assurance to Mr. Jensen or Minesen.

Fourth, Minesen points out that, for about a year after the Settlement Agreement, the Fund and the garrison continued to allow Minesen to issue SNAs. Ms. Sherman and witnesses from the garrison command acknowledge this but state that it was done at least in part for the convenience of traveling servicemembers. Many guests of the Inn are traveling due to a permanent change of station, or "PCS." The Settlement Agreement was signed in late April, just before the summer months during which most PCS travel occurs.

---

[15] *See, e.g., Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994); *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Hawai'i 36 (Haw. 2013).

49

(Relocation is less burdensome on servicemembers' families during the summer because the children are out of school.) Also, most PCS travel is planned many months in advance. The garrison command chose to continue to allow Minesen to issue SNAs, not to benefit Minesen or modify the Settlement Agreement, but rather to avoid disrupting servicemembers' travel plans. Therefore, there was no modification of the Settlement Agreement.

Fifth, Minesen claims that, even if the Inn is no longer "government quarters" under the MWR Contract, it remains "government quarters" by virtue of the JTR. This is false.

The relevant provision of the JTR (Ex. R-33 at R-50428) states that "Government Qtrs" includes "[l]odging facilities (other than privatized housing on a U.S. Installation if the lodging facilities are owned and operated by a private sector entity and the use of the lodging facilities is directed by Service regulations." Ms. Sherman testified that the use of the Inn is not "directed by Service regulations." Minesen offered no evidence or argument to the contrary. Ms. Sherman's testimony is consistent with Section I, paragraph 30.b of the MWR Contract, which provides that Minesen's

50

"personnel shall not be placed under the supervision, direction, or evaluation of a Federal officer, military or civilian, in connection the performance under this contract." Minesen's duties to the Fund and the other arms of the government stem from the Contracts, and not from Army regulations. Therefore, the Inn is not "government quarters" under the JTR.

### E.    Cure and Compensation

#### 1.    _Curable or incurable defaults_

The Fund argues that multiple of Minesen's breaches are nonmonetary and are historical facts that cannot be undone. The Fund then argues, under the "historical fact" theory, the contracts and leases are not assumable.[16] But

---

[16] The Fund cites a line of cases including _In re Deppe_, 110 B.R. 898, 904 (Bankr. D. Minn. 1990), _In re Lee West Enterprises, Inc._, 179 B.R. 204, 207 (Bankr. C.D. Cal. 1995), and, most recently, _In re Claremont Acquisition_, 113 F.3d 1029, 1034 (9th Cir. 1997). In each of those cases, the breach at issue was the failure of a franchisee to avoid an interruption in operations. The courts in those cases determined these breaches – the lapses in operations – took place and were a historical fact that the estates could not overcome. Those courts highlighted the gravity of those breaches by describing that the specific breach of interruption of operation was greatly significant in the damage it caused to goodwill such that not only did the contracts recognize its important – in one case even allowing the franchisor to terminate the agreement immediately without the necessity of any notice or time to cure – but also state statutes allowed termination in the event of interrupted operations. The Fund attempts unpersuasively to argue that the provisions governing notice of subcontractors, supplying financial reports, and requiring consent to new financing are equally material and grave. However, I decline to extend the historical fact theory beyond the franchisor-franchisee context to bar assumption.

51

Minesen must cure only material defaults that are so substantial and fundamental as to defeat the object of the agreement. *See Aickin*, 84 Hawai'i at 460 (Haw. 1997).

I am not persuaded that any tardiness in providing the reports is so substantial as to defeat the purpose of the Contracts. The requirement to provide the reports is material, but Minesen's delay to date in providing them is not material and is curable. Similarly, I find that the breaches of the timeliness requirements for notice of subcontractors and obtaining consent prior to new financing are not material.

### 2. *Nonpayment for electricity*

Minesen must immediately pay electricity bills in the amount of $561,538.89 through June 2021 plus additional amounts charged for subsequent months.

### 3. *Sale of alcoholic beverages*

Minesen must immediately cease all sales of alcoholic beverages unless and until it receives (1) explicit written permission from the garrison commander or the Fund to resume such sales and (2) a liquor license issued

52

by the Honolulu Liquor Commission or an explicit written statement from the commission that Minesen is not required to have a liquor license. No compensation for Minesen's past liquor sales is required as there is no evidence that Minesen's sales injured anyone (for example, by reducing liquor sales at approved outlets).

### 4. *Reports*

Not later than fourteen days after entry of this decision, the Fund must provide a list of all reports that Minesen is required to provide under the MWR Contract, as amended by Modification No. P00018, and that have not been provided or that do not comply with the contractual requirements (other than the due date of any tardy reports). Not later than 28 days after the Fund provides this list, Minesen must either provide the reports or file a detailed objection to the inclusion of some or all of the reports on the list.

### 5. *Pangolin Management Agreement and Indebtedness*

No further action is required to cure Minesen's failure to provide a written notice of the Pangolin management agreement.

Pangolin must immediately release (or convert to equity) all claims

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed 11/17/21   Page 53 of 57

against Minesen arising out of its repayment of the First Hawaiian Bank loan.

### 6.   *Replacement Reserve Account*

The evidence received at trial does not permit me to determine the full amount that Minesen is required to deposit in the RRA (because the Fund did not offer all of the required evidence timely). Not later than fourteen days after entry of this decision, the Fund must provide a detailed statement of the amount which it contends Minesen is required to deposit. Not later than 28 days after the Fund provides this statement, Minesen must file a statement describing any amount that it contends it is not obligated to deposit, including factual and legal support for its contentions, and must deposit any portion of the amount that it does not dispute.

### 7.   *Room overcharges*

Minesen must immediately refund $1,097,438.95 to the Fund. In addition, Minesen must take reasonable steps to refund those guests whom it charged more than the maximum lodging portion of the transient lodging allowance. Minesen must promptly ascertain the names of the affected

54

guests and the amount owed to each of them. The Fund must assist Minesen to locate the guests so the refunds may be sent to them. The parties must attempt to agree on a procedure for making the refunds and to address any refunds that cannot be made.

### F. Adequate Assurance of Future Performance

There is no dispute that Minesen has the financial ability to perform its future obligations under the Contracts. Although Minesen threatened to seek a termination for infeasibility under Section II, paragraph 11 of the MWR Contract, it did not make such a claim at trial and instead depicted its operation as successful. Despite the loss of the SNAs, Minesen's financial results have been outstanding.

The Fund's arguments about future performance rest on its lack of confidence in Minesen's intention, rather than its ability, to perform. Minesen's track record of performance has been poor. It has consistently adopted unreasonable interpretations of the Contracts. When the Fund's contracting officer has taken positions that Minesen does not like, Minesen has approached the garrison command hoping to get a better answer:

55

playing one element of the Army against another in this fashion has not engendered trust. Minesen seems to have gone out of its way to make life more difficult for the Fund, probably in the hope that the Fund would elect to terminate the MWR Contract for convenience. (If the Fund did so, the Fund would have to pay Minesen the discounted present value of its projected future net cash flows before debt service. This would give Minesen the monetary equivalent of continued operation of the Inn without the effort and risks.)

Nevertheless, I find that, if Minesen makes the cure payments that this order requires, Minesen will have provided adequate assurance of future performance. It would be irrational and self-defeating if Minesen defaulted after investing millions of additional dollars to make the required cure payments. In addition, Minesen and the Fund are bound by my interpretations of the Contracts, so there should be fewer disputes in the future.

## IV. CONCLUSION

Minesen's motion is granted conditioned upon its completion of the

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed   11/17/21   Page 56 of 57

cures set forth above. The court will hold a further hearing on January 24,

2022, at2:00 o'clock p.m., to address the status of Minesen's cure.

**END OF MEMORANDUM OF DECISION**

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 505   Filed  11/17/21   Page 57 of 57