Date Signed:
July 28, 2022



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>THE MINESEN COMPANY,<br><br>                   Debtor. | Case No. 19-00849<br>Chapter 11<br><br>Dkt. 602, 692 |

## ORDER DENYING CONFIRMATION OF PLAN

The Minesen Company, debtor and debtor in possession ("**Minesen**"), seeks final approval of a disclosure statement (ECF 602) and confirmation of an amended plan of reorganization (ECF 692).[1]

I previously approved the disclosure statement on a conditional basis (ECF 614). There were no further objections to the disclosure statement, so I will APPROVE it on a final basis.

---

[1] I held a hearing on the matter on July 25, 2022. Before the hearing, the parties informed the court that they did not wish to present any witnesses or other evidence at the hearing and instead would rely on their filings.

Shortly before the hearing, Minesen filed an amended plan that resolved the objections of the State of Hawaii and the Office of the U.S. Trustee, and some of the objections of The U.S. Army Morale, Welfare, and Recreation Fund (the "Fund"). Minesen's effort to meet these objections is commendable. But the plan still suffers from several fatal defects.

**1. Noncompliance with § 1129(a)(10)**

Section 1129(a)(10)[2] provides that, "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." Section 101(31) sets out the entities considered to be "insiders" and, for corporations, includes directors, officers, persons in control, and the relatives of those individuals as well as affiliates.

According to Minesen, the only classes of impaired claims are Class 4 (the subordinated claim of Pangolin LLC) and Class 5 (the equity interests of Max Jensen, the sole owner of Minesen).

---

[2] Unless otherwise indicated, all references to sections refer to the Bankruptcy Code, 11 U.S.C., and all references to rules refer to the Federal Rules of Bankruptcy Procedure.

Class 5's acceptance of the plan probably does not satisfy this section, because Class 5 is a class of equity interests, not claims. Even if Class 5 counts for this purpose, the section is not satisfied. The only party with a vote in Class 5 is Mr. Jensen, and he is undoubtedly an insider of Minesen since he is an officer and director and the person in control of Minesen, § 1129(31)(B)(i)-(iii). Therefore, his vote does not count for purposes § 1129(a)(10), and Class 5 has not accepted the plan for this purpose.

Similarly, Class 4's acceptance of the plan does not count for purposes of this section. Pangolin is wholly owned by Mr. Jensen and his mother, Nikki Peters. Mr. Jensen is an insider of Minesen. So is Ms. Peters, because she is a relative of Mr. Jensen, § 101(31)(B)(vi). This means that Pangolin is an "affiliate" of Minesen, § 101(2)(B), and also an "insider" of Minesen, § 101(31)(E).

Therefore, Mr. Jensen's and Pangolin's acceptances of the plan are disregarded and § 1129(a)(10) is not satisfied because the plan has impaired classes but does not have a class that accepts the plan after discounting votes of insiders.

## 2. Unilateral Modification of Assumed Executory Contracts

The plan would effectively modify certain contracts between Minesen, the Fund, and the U.S. Army, without the consent of Minesen's counterparties, contrary to §§ 365 and 1129(a)(1).

The centerpiece of the plan is the assumption of the Contracts, as identified and discussed in my order entered on November 17, 2021 (the "Assumption and Cure Order," ECF 505).[3]

Section 365 permits a debtor in possession to assume, assume and assign, or reject executory contracts and unexpired leases such as these contracts. But § 365 does not permit a debtor to modify an executory contract or unexpired lease without the counterparty's consent; rather, the debtor must take the contract with all of its burdens. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531–32(1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* . . . ."); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir.

---

[3] The Picnic Area Lease discussed in my prior order has expired and Minesen can no longer assume it, so the term "Contracts" in this order does not include it.

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 706   Filed 07/28/22   Page 4 of 14

1995) ("When the debtor assumes the lease or contract under § 365, it must assume both the benefits and the burdens of the contract."); *U.S. Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1473 (4th Cir. 1990) ("[A] debtor may not assume the favorable aspects of a contract . . . and reject the unfavorable aspects of the same contract.") (cleaned up). In other words, contract assumption is a take it or leave it proposition.

At least three provisions of the plan violate this basic principle.

Section 5.1.E of the plan provides that Minesen "shall be authorized to charge the maximum allowed per diem reimbursement amounts allowable to government travelers under the Joint Travel Regulations . . . ." This would change sections 14 and 15 of the MWR Contract, which provide that room rates will be fixed by agreement between Minesen and the Fund from time to time (but will never exceed the reimbursable amount).

Section 5.1.F deals with the Replacement Reserve Account. These provisions are not the same as section 12 of the MWR Contract.

Section 5.1.G provides a mechanism for the resolution of disputes about post-petition disputes under the agreements. But those agreements

5

contain their own dispute resolution and remedial provisions that cannot be changed without the Fund's consent.

Because the plan would modify the Contracts without the consent of the Fund, the plan violates § 365 and does not comply with the requirement of § 1129(a)(1).

3. **Failure to Provide Prompt Cure of Defaults under Assumed Executory Contracts.**

Minesen can assume the Contracts only if it "cures, or provides adequate assurance that [Minesen] will promptly cure," any of its defaults under the Contracts. After ten days of trial over a three-month period, preceded by extensive discovery and briefing and followed by posttrial briefing, I entered the Assumption and Cure Order that states in detail the six defaults that Minesen needed to cure in order to assume the agreements (ECF 505 at 52-56).[4]

Over eight months have passed since I entered the Assumption and

---

[4] Both parties have appealed the Assumption and Cure Order. I did not intend it to be a final order because it leaves many issues open for further decision.

6

U.S. Bankruptcy Court - Hawaii   #19-00849   Dkt # 706   Filed  07/28/22   Page 6 of 14

Cure Order. Minesen has completed its cure of three of the six defaults (nonpayment for electricity, sale of alcoholic beverages, and reports[5]). But Minesen has not cured the other three defaults.

### A. *Pangolin Subordination*

The Assumption and Cure Order requires that "Pangolin must immediately release (or convert to equity) all claims against Minesen arising out of its repayment of the First Hawaiian Bank loan." Pangolin did not do this "immediately." The plan provides for the subordination of Pangolin's claim but the plan will not go into effect unless and until it is confirmed and its Effective Date occurs.

### B. *Replacement Reserve Account*

The MWR Contract provides that Minesen must deposit four percent of its gross revenues in a Replacement Reserve Account ("RRA"). Section 12.c of the MWR Contract (trial exhibit M-1) provides that the RRA "shall be used for the planned renovations, major repairs and replacements of the

---

[5] In its papers, the Fund said that Minesen had not provided all of the reports and that some of them did not comply with GAAP and USALI (*See, e.g.,* ECF 669 at 20). In the Amended Plan, Minesen claimed that it has now submitted all required Financial Reports, and the Fund did not claim otherwise at the hearing on the plan.

facilities[,] furnishings, fixtures, interior and exterior finishes, and other component[s]." Section I, paragraph 13 provides that "Planning for the upgrades and/or renovations of the [Inn] will occur at a minimum of every three years. The [Fund's] Contracting Officer … will jointly with Minesen approve all capital expense plans."

Minesen has not made the required deposits or sought the Fund's approval of a spending plan for many years. The Assumption and Cure Order holds that the amount that Minesen had to deposit in the Replacement Reserve Account could not be determined because the Fund did not offer the relevant evidence until too late. Therefore, the Assumption and Cure Order establishes a procedure to ascertain the amount owed.

Minesen says that it began making the required deposits in January 2022 but should not be required to make deposits for prior periods because it actually spent more than four percent of its gross income on appropriate items. Minesen has provided the Fund with documentation to corroborate its expenditures.

Minesen's approach misconstrues the agreements. The MWR Contract

8

contemplates that the parties would agree, in advance, on plans for "renovations, major repairs and replacements," and that Minesen could use the funds in the RRA to carry out those plans. In other words, it was never sufficient for Minesen to simply send the Fund a batch of receipts, invoices, and the like; rather, Minesen had to first deposit the funds, then explain the proposed expenses and get the Fund's approval to withdraw sufficient funds for the approved expenditures. Minesen has instead argued in its briefing "Simply stated, the Debtor cannot cure the RRA until MWR reviews the receipts that Minesen has provided and retroactively approves a reasonable amount of the expenses." (ECF 678 at 19).

Although I have suggested that the Fund should consider granting retroactive approval of Minesen's RRA expenses, it is Minesen's duty to cure their breach of spending these amounts with prior approval. To obtain retroactive approval, Minesen must give the Fund the information that Minesen should have provided long ago —a three-year (or shorter) plan for "renovations, major repairs and replacements" – rather than a document dump of invoices and receipts.

9

## C. Room Overcharges

In the Assumption and Cure Order, I found that, for several years, Minesen had charged higher room rates than permitted, and that the Fund had overpaid by $1,097,438.95 and certain soldiers had overpaid a total of $9,027.00. I ordered that "Minesen must immediately refund $1,097.438.95 to the Fund" and must take reasonable and prompt steps to identify and reimburse the soldiers whom it had overcharged.

Minesen has not complied with these requirements. Rather than "immediately" refunding the Fund, Minesen spent months locating an escrow agent and negotiating the terms of the escrow. Minesen only recently deposited in escrow the amount I ordered it to pay the Fund.

Minesen has not refunded any money to any soldiers. Minesen has retrieved the guest folios for the relevant time periods from its prior software vendor.[6] Minesen presumably needs the folios to identify the overcharged

---

[6] Initially, Minesen reported that it could not obtain the folios due to a ransomware attack. Using the common meaning of the term "ransomware," this meant that a hostile actor had gained access to Minesen's computer and prevented Minesen from viewing the data on its computers. Minesen now admits, however, that there was no ransomware attack. Rather, the data was in the possession of its "former Property Management Software provider" who refused to release the data without being paid. This is not "ransomware," and it is not even clear that it amounts to a ransom: although the record in this respect is incomplete, the prior vendor may very well have been entitled to payment for its services. Minesen's

soldiers, but Minesen has apparently made no progress in that regard. Instead, Minesen has used the folios to attempt to argue that the overcharge is less than I found.[7] So far as I can tell from the record, Minesen has done little or nothing to provide refunds to the soldiers.

### D. Conclusion about Contract Assumption

Thus, Minesen has not cured all of its defaults under the MWR contracts. Minesen can confirm its plan only if it provides adequate assurance that it will promptly cure its defaults.

I identified all of the defaults over nine months ago. Minesen could have cured most of its defaults very quickly by causing Pangolin to release or subordinate its claims, paying four percent of its gross revenues into the RRA, and paying the room overcharge amount to the Fund.[8] Instead,

---

misleading statements about the reason for its noncompliance leads me to doubt the sincerity of its efforts to cure its defaults.

[7] Minesen claims that the folios are newly discovered evidence because Minesen gained access to them recently. This contention strains credulity. Minesen has known about the overcharge allegations since April 2021 at the latest. Minesen presumably knew all along that the former software vendor had Minesen's folio data. Minesen has not explained why it failed to obtain access to that data as soon as the overcharge issue was raised. Minesen can't claim that evidence it knew about, but simply failed to access, is "newly discovered."

[8] It might not have been possible to correct the overcharge to individual soldiers by now, because Minesen had to identify the soldiers and find their current whereabouts. But to date Minesen has made no serious effort to complete that process.

Minesen delayed the Pangolin resolution, attempted to avoid its obligation to fund the RRA by demanding retroactive approval of expenses without providing a capital expense plan, and put the room overcharge amount in escrow while it searched for ways to reduce its obligation.

This behavior is typical for Minesen. As I found in the Assumption and Cure Order:

> Minesen's track record of performance has been poor. It has consistently adopted unreasonable interpretations of the Contracts. When the Fund's contracting officer has taken positions that Minesen does not like, Minesen has approached the garrison command hoping to get a better answer: playing one element of the Army against another in this fashion has not engendered trust. Minesen seems to have gone out of its way to make life more difficult for the Fund, probably in the hope that the Fund would elect to terminate the MWR Contract for convenience. (ECF 505 at 55-56.)

Based on the existing record, I cannot find that Minesen has provided adequate assurance of prompt cure.

### 4. Improper Treatment of Fund's Claims as "Unimpaired"

The plan treats the Fund's claims as unimpaired within the meaning of § 1124. The Fund objects to this treatment. I agree with the Fund's conclusion but not with all of its reasoning.

12

A class of claims is impaired under a plan unless the plan (1) "leaves unaltered" all of the rights of the creditors in that class or (2) does not alter the creditors' rights except for cure of defaults, reinstatement of maturity, and compensation for damages caused by any default. § 1124.

The plan does not meet the first of these requirements. But for the pendency of the automatic stay and confirmation of the plan, the Fund could take immediate action to terminate the Contracts. The plan would deprive the Fund of that contractual right.

Minesen argues that the plan complies with the second option, claiming that it only provides for cure of defaults under the Contracts. This disregards the provisions described above, which modify the Contracts and are unrelated to cure of defaults. Therefore, the class of claims in which the Fund's claims are placed is impaired, contrary to its treatment under the plan.

5. **Good Faith**

Section 1129(a)(3) provides that the court may confirm the plan only if "the plan has been proposed in good faith . . . ."

13

In this circuit, "[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. The requisite good faith determination is based on the totality of the circumstances." *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).

Moreover, "§ 1129(a)(3) directs courts to look only to the proposal of a plan, not the terms of the plan." *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031 (9th Cir. 2019).

I find that Minesen proposed the plan in good faith within the meaning of § 1129(a)(3). Minesen filed the plan in order to avoid termination of the Contracts, which are Minesen's most important assets. While the plan and Minesen's conduct falls short in many respects, I cannot say that Minesen's proposal of it was inconsistent with the goals of the Bankruptcy Code.

I therefore overrule the Funds' "good faith" objections.

* * *

For these reasons, confirmation of the plan is DENIED.

**END OF ORDER**

14